**In re 7TH STREET & BEARDSLEY PARTNERSHIP, an Arizona limited partnership, Debtor.**

**Bankruptcy No. 93–12949–PHX–CGC.**

United States Bankruptcy Court,
D. Arizona.

Nov. 30, 1994.

Edward E. Davis, Alisa C. Lacey, Davis & Lowe, P.C., Phoenix, AZ, for debtor.

Mary B. Fylstra, Gammage & Burnham, P.C., Phoenix, AZ, Janet Jeter Gould, Janet Jeter Gould, P.C., Scottsdale, AZ, for Southeast Deer Valley Associates Ltd. Partnership.

## ORDER

CHARLES G. CASE, II, Bankruptcy Judge.

### I. INTRODUCTION

The Court held an evidentiary hearing on two discrete issues relating to the confirmation of this Debtor's Plan of Reorganization. These are 1) whether a consenting impaired class has accepted the Plan as required by 11

U.S.C. § 1129(a)(10), and 2) whether the Class 5 vote cast by creditor Southeast Deer Valley Associates ("SEDV") should be designated, pursuant to 11 U.S.C. § 1126(e), as not having been cast in good faith and therefore not counted. A corollary to the second issue is what remedy, if any, is available to the Debtor if it is successful in designating SEDV's claim.

This decision constitutes findings of fact and conclusions of law as required by Rule of Bankruptcy Procedure 7052.

## II. FACTS

Debtor is an investment limited partnership with two real property assets. The first is a large tract of land near 7th Street and Beardsley Road in Phoenix, Arizona, consisting of approximately 77 acres (the "Beardsley Property"). The second, acquired immediately prior to the bankruptcy, is a smaller 14–acre parcel located to the west of metropolitan Phoenix (the "West Side Property"). The Debtor also has over $400,000.00 in cash.

The Debtor's general partner is Republic Investment Company, a general partnership consisting of Hamilton McRae and Jay Stuckey ("Republic"). Republic is the general partner of numerous other partnerships owning land in the greater Phoenix area. SEDV[1] is the holder of a claim in excess of $4 million, secured by its interest as the first beneficiary under a trust agreement involving the Beardsley Property.

In December, 1993, immediately prior to the filing of the Debtor's bankruptcy, the Debtor acquired the West Side Property from Joan Blackbourn. The stated price was $27,000. Ms. Blackbourn was paid $2,000.00 in cash. The Debtor then took title to the property subject to an existing $25,000.00 deed of trust in favor of Larry Urban. As part of the negotiation for the purchase of the property, Mr. Urban agreed with the Debtor to discount his note (the "Urban Note") to $7,000.00, payable over three years.

Hamilton McRae, on behalf of Republic, testified the West Side Property was a good investment for the Debtor at the price paid. Mr. McRae stated that it was his intent to subdivide the land into five parcels and sell each for $12,000.00 to $15,000.00, yielding $60,000.00 to $75,000.00 for an investment of $9,000.00 plus modest development costs. Mr. McRae acknowledged that, at the time he was negotiating for the purchase of the West Side Property, he was uncertain which of the many partnerships he and Mr. Stuckey controlled would be the eventual owner of the parcel.

At the time of the purchase of the West Side Property, the Debtor had been engaged for several years in unsuccessful negotiations with SEDV regarding the restructuring of its note on the Beardsley Property. A foreclosure sale of the Beardsley Property had been noticed and was rapidly approaching. Mr. McRae knew that bankruptcy was likely, if not inevitable. He acknowledged that one motivation for putting the West Side Property into the Debtor was that the Urban Note might constitute a "consenting impaired class" for purposes of plan confirmation in a Chapter 11 case for the Debtor. *See,* 11 U.S.C. § 1129(a)(10).

After the purchase of the West Side Property, on December 17, 1993, the Debtor filed this Chapter 11 case.

The Debtor filed its original Plan of Reorganization on February 18, 1994. An initial hearing on the Debtor's Disclosure Statement was held on April 25, 1994, and was continued until May 21, 1994. In the interim, the Debtor amended the Disclosure Statement as required after the first hearing. Before the second hearing on the Disclosure Statement, SEDV filed a notice of its election under Section 1111(b)(2) to have the Beardsley claim treated as fully secured.

Debtor's Plan has gone through 4 iterations. The original Plan classified creditors and interest holders into 9 classes as follows:

1. Administrative claims;

---

1. SEDV is a limited partnership, the sole general partner (50% interest) and 5% limited partners of which is Triad Development Corporation. Triad is a wholly owned subsidiary of Security Savings, in receivership with the Resolution Trust Corporation. Security Savings also held a 30% limited partnership interest, with the remaining 15% limited partnership interest held by an individual. RTC is therefore the entity in control of SEDV.

2. Priority claims;
3. Secured tax claims;
4. Secured claim of SEDV;
5. Secured claim of Larry Urban;
6. Unsecured claims with lien rights (i.e., SEDV's non-recourse deficiency claim);
7. General unsecured claims;
8. General partnership interest;
9. Limited partnership interests.

The original Plan provided for payment in cash, in full, on the effective date of both Class 3 (secured tax claims) and Class 7 (General unsecured claims). SEDV's claim secured by the Beardsley Property, Class 4, was to receive payments at 8% over 15 years on the allowed amount of its claim. Class 5, the Urban Claim, was to receive $7,000.00 with interest at 7% over 3 years.[2] Class 6 is the unsecured deficiency claim of SEDV, the proposed treatment of which was a 3% cash dividend over 8 years. Class 8, the general partnership interest, was required to contribute $2,000.00 to retain its interest and Class 9, the limited partnership interests, were required to contribute $3,462.00 per unit.

Thus, the Debtor's initial concept was to cash out all claims except the Urban Claim and SEDV's Beardsley Claim, with the separately classified Urban Claim[3] satisfying Section 1129(a)(10) and SEDV's claim crammed down under Section 1129(b)(2)(A)(i). The Debtor addressed the absolute priority rule with the "new value" contributions of the partners. *See, In re Bonner Mall Partnership*, 2 F.3d 899 (9th Cir.1993).

What happened next is often the fate of best laid plans.[4] After the first plan was filed, and seeing the confirmation battle ahead, SEDV contacted Urban, offered him the same deal the Debtor had offered, and bought his claim. SEDV did not do so as an investment; no one from FGB Realty Advisors, Inc., the asset manager hired by SEDV, did any investigation or due diligence on the claim. No one visited or walked the property. No price negotiations took place. No appraisal was done. No environmental or title report was ordered. In short, the sole purpose of the purchase was to defeat the plan by depriving Debtor of a consenting impaired class.

The Debtor then counter-punched. The third iteration of the Plan,[5] denominated the Second Amended Plan, was filed on June 2, 1994, a week after SEDV acquired the Urban Claim. In this version, the two previously unimpaired classes became impaired and one previously impaired class became unimpaired. Specifically, the treatment of Class 3 (secured tax claims) and Class 7 (general unsecured claims) was modified. Payment in full on the effective date disappeared. Now the tax claims were stretched over a 3–year term with interest at 9.124% per annum. The unsecured claims were to be paid in full, in cash, without interest, 6 months following the effective date. Meanwhile, treatment of the Urban Claim, now held by SEDV, was changed to "unimpaired," with the Debtor to surrender the collateral to the holder of the claim.[6]

Thus, the Debtor had now pinned its Section 1129(a)(10) hopes on the secured tax claims and the unsecured creditors. SEDV, in response to this change in strategy, again took out its checkbook and purchased the tax

---

**2.** This treatment was consistent with the agreement made between the Debtor and Larry Urban at the time the West Side Property was purchased.

**3.** The is no question that the Urban Claim was properly classified separately since it is the only claim secured by the West Side Property. *See, In re Commercial Western Finance Corp.*, 761 F.2d 1329 (9th Cir.1985).

**4.** Although the language of Robert Burns' poem may be obscure, its meaning is clear:
   The best laid schemes o' mice and men
   Gang aft a-gley.

**5.** The First Amended Plan modified treatment of these classes in ways that are not material to this decision.

**6.** A final iteration, the Third Amended Plan, filed June 15, 1994, contained a new class, the "United Title secured claim." This class was to be paid without interest 6 months after confirmation or out of the first post-confirmation capital contribution by equity, whichever occurs later. The treatment of all other classes remain substantially the same. No vote was received for this class; therefore, its treatment is not relevant to the issues discussed in this decision.

claims during the balloting period.[7] However, unlike its acquisition of the Urban Claim, SEDV did have a legitimate business reason to pay the real estate taxes that were senior to its lien and, indeed, had received the funds to do so from the RTC some time before. The timing of the purchase clearly suggests, however, that a primary motivation was to eliminate these claims from contention as the "consenting impaired class."

■ In this way, the unsecured class, previously unimportant, now takes center stage. The only members of the unsecured class are Deloitte & Touche ("Deloitte"), the Debtor's pre-petition tax accountant and the holder of a claim in the amount of $490.00, and Republic, an insider. SEDV asserts that Deloitte also is an insider. Therefore, the acceptance or rejection of the Plan by this Class depends entirely upon whether insider status is appropriate for Deloitte.[8]

Notwithstanding the existence of the pre-petition claim, Debtor filed an Application for the appointment of Deloitte as a tax accountant professional for the estate, to be paid from the assets of the estate. The Application disclosed the existence of the $490.00 claim, was noticed to all parties in interest, and following the receipt of no objection, Deloitte's employment was approved by Order dated April 25, 1994. Deloitte has been acting in that capacity since its appointment.[9]

One final twist. SEDV contacted Don Goldman, the partner at Deloitte responsible for the Debtor's account, and tried to buy the $490.00 claim. Goldman then telephoned McRae, who testified that he did not attempt to sway Goldman's vote. However, according to McRae, Goldman's tone of voice made it clear that he knew that selling to SEDV "could have adverse consequences" for the Debtor. The fact that Deloitte did not sell at face value, instead opting to wait six months for payment under the Plan, has been cited by SEDV as evidence of Deloitte's insider status.

On that point, Goldman testified that his firm does about $60,000 a year in business with various Republic entities. Deloitte's sole function for the Debtor was the preparation of tax returns and the giving of occasional tax advice. It did not participate in the formulation of the Plan, has not prepared interim reports and has not participated in the bankruptcy in any other way. McRae did not contact Goldman regarding Deloitte's vote. Neither Goldman nor Deloitte has any financial interest in any Republic-related investments. Goldman was not asked to waive Deloitte's pre-petition claim as a condition of accepting employment from the estate and has not done so. In his view, Deloitte and the Debtor have a purely arm's-length accountant/client relationship.

Deloitte voted to accept the Plan. SEDV voted its Beardsley Claim to reject, did not vote the tax claims, and voted the Urban Claim to reject.

Against this background, SEDV has moved to dismiss the case and objected to confirmation on the ground that Debtor is incapable of satisfying Section 1129(a)(10). SEDV argues that Deloitte's vote should not count because it is an insider and no other class has accepted the Plan. The Debtor argues that Deloitte's vote should count, that SEDV's negative vote on the Urban Claim should be designated pursuant to 11 U.S.C. § 1126(e) as having been filed in bad faith, and that, as an equitable remedy, Class 5 should be deemed a "consenting impaired class" since Larry Urban would have voted "yes" had he been given the chance.

7. SEDV thereafter voted none of the claims. Debtor has likened this strategy to the exercise of a "pocket veto" by SEDV.

8. SEDV asserts that its unsecured non-recourse deficiency claim, allowable by virtue of Section 1111(b)(1), was improperly classified separately and would control the unsecured class if a member of it. However, SEDV made the Section 1111(b)(2) election as to both the Beardsley and Urban claims and no longer holds an unsecured claim of any kind. SEDV argues that it was "forced" to make the election by the discriminatory classification scheme and that if it had been "properly" classified, it would have voted no and controlled the class. This argument fails. Its remedy was to forgo the election, vote no and challenge the classification scheme. *See, e.g., In re Tucson Self–Storage, Inc.,* 166 B.R. 892 (9th Cir. BAP 1994). Therefore, this argument is now moot.

9. One can only assume that, with the Urban Claim lined up, Debtor did not foresee the eventuality that Deloitte's vote would be pivotal to its success.

## III. DISCUSSION

### A. The Mad Dash to Satisfy Section 1129(a)(10).

The motivation behind all of these maneuvers is transparent—the Debtor was striving to find a consenting impaired class and SEDV was doing all it could to thwart the Debtor in those efforts. Neither party's actions have anything to do with the merits of the Debtor's plan or the underlying rehabilitative purposes of Chapter 11. Before the parties' arguments are analyzed, an overview of the role of Section 1129(a)(10) in the confirmation process would be useful.

■ Section 1129(a)(10) is a technical requirement for confirmation. It is an obligation for the proponent of a Plan to fulfill; it is not a substantive right of objecting creditors. Indeed, the purpose and usefulness of Section 1129(a)(10) have often been questioned. *See generally,* David Gray Carlson, *The Classification Veto in Single-asset Cases Under Bankruptcy Code Section 1129(a)(10),* 44 S.C. Law Rev. 565 (1993). A recent report by the prestigious National Bankruptcy Conference recommends its abolition. *Reforming the Bankruptcy Code: The National Bankruptcy Conference's Code Review Project,* Final Report May 1, 1994, Proposal B–1, pp. 276–77.

■ As noted in the NBC's monograph, the policy underpinnings of the consenting impaired class requirement section are unclear. One presumed reason for the rule is the reasonableness of requiring some degree of creditor support for a plan that is to be involuntarily imposed on another group of creditors. Theoretically, this provides some degree of protection for interests of impaired creditors, although the relationship between the intended result and the rule is uncertain at best. The NBC's Final Report states

In practical terms, however, this particular rule adds little to the existing statutory protection found in section 1129(b)'s requirements of "fair and equitable" and no "unfair discrimination," or the remainder of section 1129(a)'s requirements other than section 1129(a)(8). It does, however, create an incentive to manipulate classes and engage in counterproductive gamesmanship since courts have often made re-

sult-oriented decisions in single-asset cases, and allowed this behavior. These decisions have then created precedents which have been wrongly applied in other contexts involving complex capital structures.

*Id.* at 277.

■ In this circuit, any change of a creditor's rights, whether for the better or for the worse, constitutes impairment and creates the possibility of a "consenting impaired class." *See In re L & J Anaheim Assoc.,* 995 F.2d 940 (9th Cir.1993). If there is an impaired class and such a class accepts, then Section 1129(a)(10) is satisfied. Whether or not the entire exercise was undertaken in good faith, however, is still subject to final determination at the final confirmation hearing. *See,* Section 1129(a)(3); *L & J. Anaheim Assoc.,* 995 F.2d 940, 943 n. 2.

The record here is a textbook example of the mischievous collateral litigation that can be spawned by Section 1129(a)(10). In this case, it started pre-petition with the purchase of the West Side Property by the Debtor, continued with the purchase of the Urban Claim by SEDV, found new life with Debtor's modifications in the Second Amended Plan, progressed with the purchase of the tax claims and the attempted purchase of Deloitte's claim by SEDV, and reached its climax with the evidentiary hearing on SEDV's Motion to Dismiss and Objections to confirmation.

### B. The Urban Claim.

■ Under this Plan, the Debtor has listed the Urban Claim as unimpaired, and therefore it should be deemed to have accepted the Plan. 11 U.S.C. § 1126(f). Since it is unimpaired, it could not satisfy the consenting impaired class requirement, even if SEDV had voted yes. While prior versions of the Plan treated the Urban Claim as impaired, the one up for confirmation now does not.

The Debtor chose to change the Urban Claim's treatment from impaired to unimpaired. In doing so, it removed the predicate necessary to reach the issue of whether Urban's pre-petition agreement to accept the treatment provided in the first plan (or his affidavit to that effect today) could be boot-

strapped into a "yes" vote, assuming the disqualification of SEDV's "no" vote.[10] Under these circumstances, it is both unnecessary and inappropriate to analyze whether this class can now be used to satisfy Section 1129(a)(10).

## C. The Tax Claims.

■ Debtor argues that SEDV's pocket veto of the acquired tax claims should be treated as a "deemed acceptance" of the Plan, citing *In re Ruti–Sweetwater, Inc.*, 836 F.2d 1263 (10th Cir.1988). *Ruti–Sweetwater* is not the law in this circuit. *See In re M. Long Arabians*, 103 B.R. 211 (9th Cir. BAP 1989). Further, although the timing of the purchase of the claims raises issues of good faith, the fact is that SEDV had the contractual right, as well as the practical economic incentive, to purchase the tax claims. Therefore, the tax claims class will not be deemed to satisfy Section 1129(a)(10).

## D. The Deloitte Claim.

■ If Deloitte is an insider, then its vote should not count and the result will be there is no "consenting impaired class." On the other hand, if not an insider, it is entitled to vote and the consenting impaired class requirement will be satisfied. It is as simple as that.

The record does not establish that Deloitte is an insider. Deloitte does not fit within the examples listed in Section 101(31); therefore, a fact-based inquiry is necessary. There is no evidence of overt influence by the Debtor over Deloitte or Deloitte over the Debtor. SEDV's argument is premised on two inferences: 1) Deloitte would do whatever necessary to please the Debtor to protect its $60,000 relationship with all the Republic entities; and 2) Deloitte must necessarily have been overly influenced by Debtor since it turned down cash payment in full from SEDV.

Neither argument is convincing. There is simply no evidence that the Republic accounts with Deloitte are sufficiently large to impair Deloitte's objectivity and there is no evidence that Republic would have pulled other work from Deloitte if it had sold its claim to SEDV or voted no. Goldman testified that he was concerned about the propriety of one creditor trying to buy the claim of another and refused to sell for that reason. He was not particularly concerned about eventual payment, either from the Debtor or from the general partner. Under these circumstances, insider status will not be found. Deloitte's vote will be counted and Section 1129(a)(10) is satisfied.

■ There remains the troubling fact that Deloitte is employed by the estate as a professional. To be so employed, Deloitte must be disinterested and must not hold or represent an interest adverse to the estate. 11 U.S.C. § 327. Regardless of the size of its claim, any creditor is necessarily not "disinterested." 11 U.S.C. § 101(14). Deloitte is such a creditor, even though the Debtor denominated its claim as "de minimis" in its application to employ Deloitte. While the application was noticed to all creditors, and no one, including the United States Trustee, objected, this prophylactic procedure is no protection where it later appears that the professional is **the key creditor** in the voting process. Without Deloitte's vote, the Debtor's plan would be unconfirmable and this case would likely be dismissed.

The remedy for this situation is not found in Section 1126(e) or 1129(a)(10) but in Section 328(c). That section provides:

[T]he court may deny allowance of compensation for services and reimbursement of expenses of a professional person … if, at any time during such professional person's employment …, such professional person is not a disinterested person.

---

10. Although SEDV's acquisition and voting of the Urban claim might well meet the standards for disqualification under Section 1126(e) and *In re Applegate Property, Ltd.*, 133 B.R. 827 (Bankr. W.D.Tex.1991), this would likely not matter since Debtor has cited no statutory or decisional authority for the proposition that the affirmative "consent" required by Section 1129(a)(10) can be proven inferentially. While this conclusion might encourage creditors to act in bad faith

when they know they can acquire **all** of the claims in a class, thereby disenfranchising the class no matter whether the votes are designated or not, the fact is that Congress has not provided a remedy for this particular mischief. This reading of the Code is consistent with the rationale of the available authority in this Circuit. *See, e.g., In re M. Long Arabians*, 103 B.R. 211 (9th Cir. BAP 1989), declining to follow *In re Ruti–Sweetwater*, 836 F.2d 1263 (10th Cir.1988).

Here, Deloitte is clearly not a disinterested person and never has been. Deloitte assumed the risk of an adverse result when it did not waive its claim at the inception of this case. This is not a mere technical violation. As noted above, Deloitte has become the critical creditor in this phase of the confirmation process. As such, it cannot remain employed and it cannot receive compensation from the estate. Therefore, Deloitte will be disqualified as an estate professional and will be denied compensation for any work done to date.

## IV. CONCLUSION

The Debtor's Second Amended Plan will be set for further hearing in due course. At that hearing, the Debtor will have the burden of establishing compliance with the remaining subsections of Section 1129(a) and with 1129(b). In particular, Debtor will have the continuing burden of demonstrating that the plan has been proposed in good faith and that the treatment of SEDV's claim is fair and equitable and does not unfairly discriminate against it.