**In re DUNES HOTEL ASSOCIATES, a South Carolina general partnership, Debtor.**

**Civ. A. No. 94–75715.**

United States Bankruptcy Court, D. South Carolina.

Sept. 20, 1995.

Julio E. Mendoza, Jr., Columbia, SC, John J. Dawson, Phoenix, AZ, for Debtor.

Michael M. Beal, Columbia, SC, Claude D. Montgomery, New York City, for S.C. Hyatt Corporation.

Sherwood M. Cleveland, Columbia, SC, Richard F. Casher, Hartford, CT, for Aetna Life Insurance Co.

## ORDER

JOHN E. WAITES, Bankruptcy Judge.

**THIS MATTER** is before the Court upon the Motion of Aetna Life Insurance Company for Ruling On Discrete Issue (Artificial Impairment—1129(a)(10)) Affecting Confirmability of Debtor's Initial Plan of Reorganization Proposed By Dunes Hotel Associates (the "Motion"), dated August 18, 1995 and the hearing (the "Hearing") held thereon on September 7, 1995. After consideration of the pleadings before the Court, the prior Orders of this Court,[1] the evidence that previously has come before this Court in this matter,[2] and arguments of counsel, this Court makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

#### The Debtor and the Hotel Property

1. On November 18, 1994 (the "Petition Date"), Dunes Hotel Associates ("Dunes") commenced the above-captioned case under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"[3]) and has remained a debtor in possession pursuant to §§ 1107 and 1108.[4]

2. Dunes is a South Carolina general partnership which was formed in 1972, and has its principal place of business in Stamford, Connecticut.

3. The general partners of Dunes are Andrick Hotel Corporation ("Andrick") and Meyers Enterprises, Inc. ("Meyers"), wholly owned subsidiaries of Pension Holding Corporation, which itself is a wholly owned affiliate of the General Electric Pension Trust ("GEPT"). GEPT is a common law trust organized under the laws of the State of New York, which manages and controls an asset portfolio of approximately $30 billion dollars, and is one of the largest pension trusts in the United States

4. Dunes' primary asset is the real property, improvements and personal property which comprise the 505–room resort/convention hotel commonly known as the Hyatt Regency Hilton Head or the Hyatt on Hilton Head Island (the "Hotel"), located on Hilton Head Island, Beaufort County, South Carolina. (Such real property, improvements and personal property, including, without limitation, the Hotel, are collectively referred to as the "Hotel Property").

5. The fair market value of the Hotel Property is at least $52,500,000.

6. SC Hyatt Corporation ("SC Hyatt") is a South Carolina corporation, and is a wholly

---

1. Such Orders include, without limitation, the Order dated August 25, 1995 entered in *Dunes Hotel Associates v. Hyatt Corporation, et al.*, Adv. Pro. No. 95–8042 (the "Hyatt Order"), as well as the Order dated May 31, 1995, and entered in respect of certain motions filed respectively by Aetna Life Insurance Company and SC Hyatt Corporation seeking, among other relief, dismissal of the within chapter 11 case (the "Dismissal Order").

2. All references herein to testimony and trial exhibits refer to the testimony and exhibits introduced by Aetna, SC Hyatt or the Debtor, as the case may be, during the course of the hearing (the "Dismissal Hearing") held on April 11–12, 1995 and May 8, 1995 in respect of (1) the Motion of Aetna Life Insurance Company for Dismissal of the Case, or, in the Alternative, for Relief from the Automatic Stay (the "Aetna Dismissal Motion"), dated February 10, 1995 and (2) the SC Hyatt Corporation's Motion to Dismiss Case or in the Alternative Terminate Exclusivity (the "SC Hyatt Dismissal Motion").

3. All references to the Bankruptcy Code, 11 U.S.C. § 101, et seq., shall be by section number only.

4. Dunes, as debtor and debtor in possession, is referred to herein as the "Debtor."

owned affiliate of Hyatt Corporation ("Hyatt"), a Delaware corporation. Hyatt and Dunes are parties to that certain prepetition Agreement and Lease dated November 2, 1973, as amended and modified from time to time (the "SC Hyatt Agreement"), relating to the Hotel Property. Hyatt subsequently assigned its rights under the SC Hyatt Agreement to SC Hyatt, which assignment the Debtor acknowledged pursuant to an amendment to the SC Hyatt Agreement, dated January 19, 1976.

7. SC Hyatt characterizes the SC Hyatt Agreement as an unexpired lease of real property within the meaning of § 365. The Debtor disputes that characterization, and characterizes the SC Hyatt Agreement as an executory management agreement.

8. SC Hyatt currently operates the Hotel pursuant to the SC Hyatt Agreement.

9. Pursuant to the terms of the SC Hyatt Agreement, the Debtor is entitled to receive certain payments (the "Hotel Payments") from Hyatt and/or SC Hyatt in respect of the Hotel.

10. Since the filing of the within chapter 11 case, SC Hyatt has continued to operate the Hotel Property.

### Aetna's Claim Against the Debtor and Aetna's Lien

11. In 1986, Dunes executed a promissory note (the "Promissory Note") and other loan documents with Aetna Life Insurance Company ("Aetna") in order to evidence and secure a loan. The original principal amount of the Promissory Note was $50,000,000.

5. As used herein, the term "Collection Costs" includes any and all fees, costs and expenses, including, without limitation, attorneys' fees, that Aetna is entitled to recover from the Debtor under the terms and provisions of the Loan Documents and/or pursuant to applicable law.

6. In addition, Aetna has reserved the right to assert a claim against the Debtor for a "late charge" owed under the Promissory Note, equal to four (4%) percent of any installment which not paid on or before the due date thereof. Aetna contends that because the Debtor failed to pay the outstanding principal balance ($46,589,-859.69) of Aetna's loan at maturity of the loan

12. As security for the obligations evidenced by the Promissory Note, Aetna holds a valid, duly perfected, first-priority lien upon and security interest (the "Lien") in, *inter alia*, the Hotel Property, together with all present and future leases and subleases affecting the Hotel Property and present and future rents, issues, profits, royalties, income and other benefits derived from the Hotel Property, including, without limitation, the SC Hyatt Agreement and the Hotel Payments made by SC Hyatt to the Debtor pursuant to the SC Hyatt Agreement. The grant and perfection of the Lien is evidenced by various instruments, documents and filings (collectively, the "Loan Documents") described more fully in the Proof of Claim filed by Aetna in this case.

13. The Promissory Note matured on July 1, 1994, at which time Dunes owed a balloon payment of all unpaid principal and accrued unpaid interest under the Promissory Note. Dunes did not pay the balloon payment due under the Promissory Note.

14. Aetna contends that, as of the Petition Date, it was owed the following sums pursuant to the terms of the Promissory Note: principal ($46,589,859.69); accrued and unpaid interest calculated at the contract rate specified in the Promissory Note (9.25% per annum) ($1,640,028.37); accrued and unpaid interest calculated at the default rate specified in the Promissory Note (4.00% per annum) ($709,201.05); Collection Costs[5] ($20,300.48); *less* a post-maturity payment made by the Debtor of $398,997.59; for a total of *$48,560,392.00*.[6] In addition, Aetna contends that, as an oversecured creditor, it is entitled to post-petition interest, calculated at the default rate of 13.25% per annum, as well as post-petition Collection Costs.[7]

(July 1, 1994), a late charge (the "Late Charge") in the amount of $1,863,594.39 is due under the Promissory Note. The Debtor disputes Aetna's entitlement to the Late Charge.

7. By its objection dated August 28, 1995 (styled "Dunes Hotel Associates': (I) Objection to Proof of Claim Filed By Aetna Life Insurance Company; (II) Counterclaims Against Aetna Life Insurance Company; and (III) Request for Assignment of Adversary Number and Commencement of Adversary Proceeding") (the "Debtor's Aetna Claim Objection")), Dunes has objected to the allowance of certain components of Aetna's claim (default interest and Collection Costs), but

15. After the filing of the within chapter 11 case, Dunes and Aetna negotiated and executed the "*Stipulation And Consent Order Conditioning Dunes Hotel Associates' Use Of Hotel Income And Providing Adequate Protection Of Aetna Life Insurance Company's Interest In Hotel Income*" dated January 23, 1995 (the "Agreed Adequate Protection Order"), pursuant to which, *inter alia*, the Debtor agreed to maintain all Hotel Payments which it received in a segregated account (the "Sequestered Funds Account"), and further provided for monthly adequate protection payments to be made to Aetna in the amount of the contract rate of interest which accrued monthly on the outstanding principal balance of the Promissory Note.

### The Existence and Payment of Prepetition Trade and Tax Claims.

16. Pursuant to the terms of the SC Hyatt Agreement, SC Hyatt is obligated to pay all employee and vendor claims as well as all real and personal property taxes assessed against the Hotel. Prior to the Petition Date, SC Hyatt paid all such claims incurred due to the operations of the Hotel.

17. Prior to the Petition Date, the Debtor did not report payments to vendors or employees of the Hotel Property as trade or business expenses in either its income tax filings or its audited financial statements.

18. As of the Petition Date there existed approximately $330,000 in employee and vendor claims incurred in connection with the operation of the Hotel (the "Trade Claims").[8] Nevertheless, at the time it filed its chapter 11 petition, the Debtor believed it had no creditors other than Aetna.

19. On the Petition Date, the Debtor filed its List of Creditors Holding 20 Largest Unsecured Claims (the "20 Largest Creditors List"). The 20 Largest Creditors List did not include any of the Trade Claims and set forth the Debtor's belief that any employee and/or vendor claims were assertable only

against SC Hyatt pursuant to the terms of the SC Hyatt Agreement.

20. Dunes' initial Chapter 11 Statements and Schedules (the "Initial Statements and Schedules") were filed on or about December 15, 1994 and listed Aetna as Dunes' only secured creditor. The Initial Statements and Schedules listed tax authorities as creditors in unknown amounts. The Initial Statements and Schedules did not include any of the Trade Claims, and contained footnotes in which Dunes stated that it believed that any tax claims or employee or vendor claims were assertable only against SC Hyatt pursuant to the SC Hyatt Agreement.

21. At the § 341 meeting of creditors held on December 19, 1994, the Debtor, through the testimony of David Wiederecht, reaffirmed that it had no creditors other than Aetna.

22. On February 10, 1995, Aetna filed the Aetna Dismissal Motion, and on February 21, 1995, SC Hyatt filed the SC Hyatt Dismissal Motion, each of which sought, among other relief, dismissal of the within chapter 11 case based upon, in part, the lack of any creditors who could accept a plan of reorganization and thereby enable the Debtor to satisfy § 1129(a)(10).

23. On April 5, 1995, Dunes filed its amended Chapter 11 Statements and Schedules (the "Amended Statements and Schedules") which, *inter alia*, retracted the Debtor's contention that any tax or vendor claims were assertable only against SC Hyatt, and, for the first time, listed the Trade Claims as well as various tax claims as claims against the Debtor.

24. With the exceptions of the Wolf Block claim (as hereinafter defined) and the Aetna Claim (as hereinafter defined), the names of and amounts owing to the creditors set forth on the Amended Schedules were taken from SC Hyatt's records; the Debtor had no such list of creditors in its records. The Debtor's name did not appear as a payor on the invoices issued by any of the vendors. SC

---

has raised no objection to the amount of principal ($46,589,859.69) and contract rate interest ($1,640,028.37) due Aetna as of the Petition Date.

8. Said trade claims include the claim of Pitney Bowes Credit Corporation (the "Pitney Bowes Claim") discussed more fully below.

Hyatt had traditionally transacted business with these vendors. Prior to the Petition Date, these creditors had never been paid out of accounts maintained by the Debtor; they had always been paid from accounts maintained by Hyatt or SC Hyatt.

25. With the exception of the Wolf Block claim, the Trade Claims and tax claims listed on the Amended Schedules were paid by SC Hyatt in accordance with the SC Hyatt Agreement and consistent with its prepetition business practices associated with the operation of the Hotel.

26. At the time SC Hyatt paid the Trade Claims and the tax claims asserted against the Hotel, both SC Hyatt and the Debtor believed that such creditors were creditors of SC Hyatt pursuant to the terms of the SC Hyatt Agreement.

27. With the exception of the Wolf Block claim, no proofs of claim were filed by or on behalf of any of the Trade Claims set forth in the Amended Schedules.

28. Aetna and SC Hyatt dispute the Debtor's attempted recharacterization of the Trade Claims and tax claims asserted against the Hotel as claims against the Debtor.

### Unpaid Prepetition Creditors of and Claims Against the Debtor

29. There are four proofs of claim currently filed against the bankruptcy estate:

    i. Aetna filed a secured claim on February 23, 1995, in the amount of $50,423,-986.39 (the "Aetna Claim").

    ii. SC Hyatt filed an unsecured claim on March 17, 1995 in the amount of $31,-438.56 (the "SC Hyatt Claim") for monies owed from the Debtor arising out of a fund entitled Fund for Furnishings and Replacements. The Debtor has objected to allowance of the SC Hyatt Claim in its entirety.

    iii. The law firm of Wolf, Block, Schorr & Solis–Cohen ("Wolf Block") filed an unsecured claim on March 20, 1995 in the amount of $2,139.57 (the "Wolf Block claim"). According to the attachment to its proof of claim, the amount alleged represents unreimbursed expenses incurred in connection with services performed in September and October 1994.

    iv. The Beaufort County (South Carolina) Treasurer filed a secured claim on December 21, 1994 for unpaid taxes in the amount of $454,786.52 (the "Tax Claim"), which taxes have been paid in full.

30. The Aetna Claim is oversecured. Absent the Bankruptcy Code § 362 stay, Aetna would be paid in full from its collateral (i.e., the Hotel Property and its revenues).

31. The fair market value of the Hotel Property exceeds the total amount of the claims filed against the Debtor.[9] The Debtor's estate is solvent and able to pay all claims in full.

### Analysis of the Wolf Block claim

32. Wolf Block is a law firm that does a substantial amount of legal work for GEPT and has represented GEPT and many of its affiliates and subsidiaries including the general partners of the Debtor since the early 1970's. In 1993 and 1994, it was paid approximately $2 million annually in respect of such work. The alleged basis for Wolf Block's claim against the Debtor is certain disbursements incurred in September and October of 1994 in connection with meetings with Debtor's bankruptcy counsel and other professionals who were to provide assistance in the bankruptcy case. The legal services giving rise to those disbursements were billed to General Electric Investment Corporation ("GEIC") for services rendered to GEPT and were paid in full in January 1995 (postpetition) from a central General Electric disbursing account.

33. The Debtor's bankruptcy counsel solicited the filing of the Wolf Block proof of claim. Approximately one week prior to the

---

9. Indeed, the Debtor has acknowledged during this case that it had equity in the Hotel Property of $5 million over and above Aetna's secured claim and that continuing income pursuant to the SC Hyatt Agreement is more than adequate to fund all adequate protection payments under the Agreed Adequate Protection Order entered January 24, 1995 and present operational expenses. In fact, preservation of the Debtor's equity in the Hotel Property was in part the basis of the Court's finding that reorganization was not objectively futile.

proof of claim bar date set in this case (March 20, 1995) and subsequent to the filing of the Aetna Dismissal Motion and the SC Hyatt Dismissal Motion, Debtor's bankruptcy counsel called Alvin H. Dorsky, the Wolf Block partner responsible for the GEPT relationship, to inquire whether, perhaps, Wolf Block was owed any money by the Debtor. Upon discovering certain unpaid disbursements, Mr. Dorsky and Debtor's bankruptcy counsel discussed the filing of a proof of claim. On or about March 16, 1995, Debtor's bankruptcy counsel followed up with a written memorandum to Mr. Dorsky, wherein he requested that Mr. Dorsky "provide a bill for your law firm's unpaid expenses to Dunes Hotel Associates in care of the Trustees of General Electric Pension Trust ... and ... file a claim for these unpaid expenses in the Debtor's Chapter 11 case." In accordance with this instruction, Wolf Block prepared and issued a bill dated March 16, 1995 to "Dunes Hotel Associates c/o Trustees of General Electric Pension Trust" in the amount of $2,139.57.

34. The issuance of a bill by Wolf Block to Dunes Hotel Associates, as opposed to GEPT, is contrary to Wolf Block's past practice of billing GEIC "for services rendered to General Electric Pension Trust ... with respect to the Hyatt Hotel, Hilton Head, South Carolina." In fact, Wolf Block's legal services, in respect of which the expenses described in Wolf Block's March 16, 1995 bill were incurred, were billed by Wolf Block in December 1994 to GEIC "for services rendered to General Electric Pension Trust from June 1, 1994, through November 30, 1994 with respect [sic] Hyatt Hotel, Hilton Head, South Carolina, including disputes with Hyatt and Aetna, Chapter 11 filing, etc."

35. Wolf Block's bills for legal services allegedly rendered in connection with this matter, as well as other GEPT investments, are paid from a central General Electric disbursing account. Wolf Block does not maintain a separate client identification number for Dunes but, instead, classifies Dunes with a matter number under the GEPT client number. Indeed, although Wolf Block represented only GEPT subsequent to the filing of the Debtor's petition, it continues to bill GEPT under the same client and matter number as it had prior to the filing of the petition when it purported to be representing Dunes. Postpetition, Wolf Block has advised GEPT as its counsel regarding the bankruptcy case and developments therein.

36. Aetna and SC Hyatt contend and the Debtor disputes that Wolf Block is not a creditor of the Debtor, because the client it represents and bills is GEPT.

37. On April 3, 1995, Aetna made a written offer to purchase the Wolf Block claim for 200% of the face amount of the claim, in order to test the *bona fides* of the Wolf Block claim. Wolf Block refused the Aetna offer.

38. Wolf Block has a close relationship with the Debtor and its ultimate parent GEPT which in the context of this case exceeds that of a normal arms length relationship between an attorney and client. Wolf Block, as a primary counsel for GEPT, the parent and sole funding agent for the Debtor's confirmation, appears to be acutely involved in efforts by the Debtor and GEPT to avoid the SC Hyatt Agreement and restructure the Aetna indebtedness through the Debtor's bankruptcy case. Wolf Block participated in the meetings regarding the planning of and decision to file the bankruptcy case and has consulted with and represented the Debtor's beneficial owner, GEPT, both prior to and since the filing of the bankruptcy case. Wolf Block asserted a claim against the Debtor in the manner suggested by and upon the request of Debtor's bankruptcy counsel and refused an offer of payment exceeding the claim amount. Wolf Block knowingly consented to impairment of its alleged claim solely for the purpose of casting an acceptance in order for the Debtor to achieve confirmation and thereby its desired restructuring of its primary secured debt, and indicated a loyalty to the goals and purposes of the Debtor and GEPT in the bankruptcy case. In utilizing its claim to be the key and essential vote to achieve confirmation, Wolf Block has willingly become the instrumentality of both the Debtor and GEPT. As such Wolf Block is significantly influenced by both the Debtor and GEPT as would affect its

actions as a creditor. As such, Wolf Block is an insider of the Debtor.[10]

39. Wolf Block was not listed as a creditor by the Debtor in its schedules and statements and was not determined to be a creditor by the professional designated to review the books and records of the operations of the Hotel.

40. There is no doubt that the Wolf Block claim, if an allowable claim, could and would ordinarily have been paid from the funds generated as a result of the operations of the Hotel Property or it could easily be paid by the solvent Debtor from its equity in the Hotel Property.

41. The Wolf Block claim, if an allowable claim, either is artificially created or preserved by the Debtor for purposes of its bankruptcy case. The proposed treatment of the Wolf Block claim under the Initial Plan and its utilization by Dunes to achieve confirmation demonstrates a lack of good faith, and is done in order to improperly manipulate and achieve confirmation of the Debtor's Initial Plan in its bankruptcy case.[11]

### The Debtor's Initial Plan and the Conditional Modification Thereof

42. On March 20, 1995, the Debtor filed that certain Disclosure Statement Accompanying Plan of Reorganization Proposed By Dunes Hotel Associates (the "Disclosure Statement"), annexed to which as Exhibit 1 was the Debtor's Initial Plan of Reorganization Proposed By Dunes Hotel Associates (the "Initial Plan").[12]

43. The Initial Plan creates the following seven classes of claims and one class of equity interests:

— Class 1 (administrative claims): Unimpaired

— Class 2 (priority, unsecured claims): Unimpaired

— Class 3 (secured tax claims arising prepetition): Impaired; however, no unpaid Class 3 claims exist.

— Class 4 (the Aetna claims): Impaired.

— Class 5 (secured claims other than claims in Classes 3, 4 or 6): Impaired; however, no such unpaid claims exist.[13]

— Class 6 (Hyatt and SC Hyatt claims): Purportedly unimpaired.

— Class 7 (unsecured, non-priority claims): Wolf Block's $2,139.57 claim is the sole unpaid claim comprising Class 7.

44. The Initial Plan and Disclosure Statement provide, *inter alia*, the following with respect to the Hyatt Claim, the Aetna Claim and unpaid unsecured claims (*i.e.* the Wolf Block claim):

i. As to the Hyatt Claim: If it is finally determined that Hyatt and/or SC Hyatt hold allowed claims against the Debtor, the Initial Plan provides that any such allowed

---

**10.** At the hearing on the Dismissal Motions, and in an additional Declaration filed with the Court on September 15, 1995, Alvin H. Dorsky, as senior partner of Wolf Block, testified that its claim was valid, accurate, and attributable to the Debtor and disputed that the claim was either artificially created or maintained or that Wolf Block was an insider of the Debtor. However, despite this testimony (which this Court notes also ultimately serves the interests of Dunes and GEPT), the Court believes that the more credible evidence indicated by the totality of the circumstances, testimony and course of conduct of these parties indicates the insider nature of Wolf Block's relationship to the Debtor. The Court finds such evidence to be more credible and convincing.

**11.** Debtor's counsel and Wolf Block itself stipulated that the record before this Court contained all of the evidence and testimony on which a

determination of the allowance of Wolf Block's claim should be based.

**12.** All further references herein to the Disclosure Statement and the Initial Plan refer, respectively, to the Disclosure Statement, as amended and restated as of July 25, 1995, and to the Initial Plan, as amended and restated as of July 25, 1995.

**13.** It is undisputed that the Pitney Bowes Claim is the only Class 5 claim alleged by the Debtor. (*See* Disclosure Statement at 30; Amended Schedules, Schedule D—Creditors Holding Secured Claims at 2). Pitney Bowes was a lessor of telephone equipment to the Hotel. Subsequent to the Petition Date, SC Hyatt made the final payment due with respect to Pitney Bowes lease, in the approximate amount of $20,000, in the ordinary course of business and consistent with SC Hyatt's prepetition conduct of business.

claim or claims will be paid in full and in cash subject to a payment limitation which will be the full amount of the difference on the Effective Date (as defined in the Initial Plan) between the market value of the Hotel Property as of the Effective Date and the allowed amount of the Aetna Claim before any reduction thereof by the New Value Contribution (as hereinafter defined), and such claims will be treated as unimpaired.

ii. As to the Aetna Claim: The Initial Plan provides for Aetna to be treated as an impaired creditor and to have an option for payment. Under the first option, Aetna may receive full payment (with recourse to a GEPT guaranty of a portion of the Aetna Claim) in the form of annual principal payments of $1 million plus monthly interest over a five (5) year period ending with a balloon payment of the balance at the end of the five (5) year period. Pursuant to the first option, Aetna's claim will be paid down to $45,000,000 and that balance restructured into the Tranche One Restructured Aetna Claim (as defined in the Initial Plan) and the Tranche Two Restructured Aetna Claim (as defined in the Initial Plan). The Tranche One Restructured Aetna Claim will be a valid and perfected first priority secured obligation in the principal amount of $30,000,000. The Tranche Two Restructured Aetna claim will be a second priority secured obligation in the principal amount of $15,000,000. Under the second option, Aetna may elect to receive a discounted cash payment of $40,-000,000 to be funded by GEPT on the Effective Date and assign its claim to the Debtor's general partners.

iii. As to unsecured claims: All allowed unsecured claims, except for the Hyatt Claim and including the Wolf Block claim, will be paid in full, with interest, within the first six (6) months following the Effective Date. As to the unsecured creditors listed in the Amended Schedules and Statements that previously received payment through the operations of the Hotel Property, the Debtor will forego its rights under the Bankruptcy Code to avoid or otherwise recover such payments. The Debtor reserves all of its rights against Hyatt and/or

SC Hyatt with respect to their unauthorized post-petition disbursements to any individuals or entities affiliated with Hyatt.

45. At the time it filed the Initial Plan, and after an investigation performed by the Debtor's expert witness, Marty P. Ouzts, in February 1995, the Debtor knew that the only unpaid claims against its bankruptcy estate were the Aetna Claim, the Hyatt Claim and the Wolf Block claim. At the time it filed the Initial Plan, the Debtor knew that Aetna and SC Hyatt would vote to reject the Initial Plan.

46. On May 5, 1995, Dunes filed the "Conditional Modification of the Debtor's Initial Plan of Reorganization Proposed by Dunes Hotel Associates" (the "Conditional Modification"). The Conditional Modification provides, *inter alia*, that:

in the event the Court finds the Debtor's Plan unconfirmable, the modification may be invoked to pay Aetna and Hyatt immediately and in full on their allowed claims. Funding of this payment in full will be by GEPT to the general partners and the Debtor for distribution through the Plan as "new value" from the Debtor or its general partners.

47. The Debtor has asserted repeatedly that GEPT will fund the Initial Plan or, if necessary, the Initial Plan as modified by the Conditional Modification. Pursuant to that certain Statement of Financial Commitment of the Trustees of General Electric Pension Trust Regarding the Debtor's Initial Plan of Reorganization Filed By Dunes Hotel Associates, and the Conditional Modification of the Debtor's Initial Plan of Reorganization Proposed By Dunes Hotel Associates, dated June 29, 1995, and subject to the caveats, restrictions and limitations set forth therein, GEPT has stated that it will provide to the Dunes general partners the full amount necessary to enable Dunes and Reorganized Dunes to perform under the Initial Plan as confirmed by the Bankruptcy Court.

48. Pursuant to its ballots dated August 16, 1995, Aetna voted to reject the Initial Plan as well as the Conditional Modification. Pursuant to its objection to confirmation dated August 29, 1995, and as set forth more

fully therein, Aetna has objected to confirmation of the Initial Plan as well as to confirmation of the Initial Plan as modified by the Conditional Modification.

49. Pursuant to its ballot dated August 23, 1995, SC Hyatt voted to reject the Initial Plan as well as the Conditional Modification. Pursuant to its objection to confirmation dated August 29, 1995, and as set forth more fully therein, SC Hyatt has objected to confirmation of the Initial Plan as well as to confirmation of the Initial Plan as modified by the Conditional Modification.

50. With the exception of Wolf Block, no creditor of the Debtor has voted to accept the Initial Plan.

### CONCLUSIONS OF LAW

I. *The Debtor's Initial Plan Cannot Be Confirmed As No Accepting Impaired Class of Claims Exists for Purposes of Bankruptcy Code § 1129(a)(10).*

Bankruptcy Code § 1129(a)(10) provides as follows:

(a) The court shall confirm a plan only if all of the following requirements are met:

.    .    .    .    .

(10) If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

11 U.S.C. § 1129(a)(10). In this case, as the Initial Plan impairs one or more classes of claims, the Debtor must obtain the acceptance of an impaired class of claims as a necessary precondition to confirmation of the Initial Plan. However, there exists no truly impaired class of claims in this case that have voted to accept the Initial Plan within the purview of § 1129(a)(10). Accordingly, the Initial Plan is unconfirmable as a matter of law.

As the proponent of the Initial Plan and the party seeking confirmation, the Debtor has the burden of showing that the plan complies with the statutory requirements for confirmation. *In re Locke Mill Partners,* 178 B.R. 697, 700 (Bankr.M.D.N.C. 1995). The Debtor's burden of proof with respect to the Bankruptcy Code's confirmation requirements applies to all of the requirements of § 1129(a), including § 1129(a)(10). *Id.*

#### A. *The Initial Plan's Classification Scheme.*

The Initial Plan creates seven classes of claims (and one class of equity interests). The Initial Plan expressly renders Classes 1 (administrative claims), 2 (priority, unsecured claims) and 6 (SC Hyatt and Hyatt Corporation claims) unimpaired. *See* Initial Plan, §§ 4.1, 4.2 and 4.3 ("... Dunes asserts that the Class 6 Hyatt Claim (if any) is *unimpaired* pursuant to the Plan and Bankruptcy Code § 1124....").[14] However, depending on the ultimate extent of SC Hyatt's claim, SC Hyatt may or may not be impaired under the Initial Plan. *See* Initial Plan, § 4.3. To the extent that the Initial Plan impairs SC Hyatt's claim, SC Hyatt has voted to reject the Initial Plan.

The Initial Plan expressly renders the remaining four classes of claims impaired. Class 3 (secured tax claims arising prior to the Petition Date) is impaired under the Initial Plan. *See* Initial Plan, § 5.4. However, no Class 3 claims exist, as all tax claims that were in existence as of the Petition Date and scheduled by the Debtor have been paid in full by SC Hyatt.[15] Class 4 (the Aetna claim) is impaired under the Initial Plan. *See* Initial Plan, § 6.5. Aetna has voted to reject the Initial Plan. Class 5 (secured claims other than claims in Class 3, Class 4 and Class 6) is impaired under the Initial Plan. *See* Initial Plan § 7.3. However, no Class 5 claims exist. The only alleged creditor identified by

14. The Debtor's reasoning that SC Hyatt is unimpaired under the Initial Plan and within the meaning of § 1124 is based on the Debtor's assertion in the Initial Plan that the SC Hyatt claim "will be paid: (a) fully and in Cash on the Effective Date if the [SC Hyatt] Claim is then an Allowed Claim...." *See* Initial Plan, § 4.3.

15. See Debtor's form of Ballot for Accepting or Rejecting Debtor's Initial Plan of Reorganization Proposed By Dunes Hotel Associates ("Form of Ballot") at 2 (stating that Class 3 and Class 5 "apparently are not occupied by any unpaid claims.").

the Debtor as holding a potential Class 5 claim is Pitney Bowes. *See* D.S. at 34; Debtor's First Amended and Restated Schedules (the "Amended Schedules"), Schedule D—Creditors Holding Secured Claims. However, Pitney Bowes is not a secured (or unsecured) creditor of the Debtor because the obligations under the Pitney Bowes lease were paid in full by SC Hyatt in the usual course of the operations of the Hotel.[16]

Class 7 (unsecured, nonpriority claims) is impaired under the Initial Plan. *See* Initial Plan, § 8.2. Class 7 consists solely, if at all, of the $2,139.57 claim of Wolf Block.[17] The Amended Statements and Schedules list 200 purported unsecured Trade Claims aggregating in excess of $330,000. However, in fact, the Trade Claims were claims against SC Hyatt, not claims against the Debtor. Moreover, with the exception of the Wolf Block claim, each alleged unsecured claim reflected in the Amended Statements and Schedules has been paid by SC Hyatt after the Petition Date pursuant to the terms of the SC Hyatt Agreement, in accordance with past practice and in the usual operations of the Hotel. Accordingly, Class 7 consists solely, if at all, of the $2,139.57 claim of Wolf Block. (Class 7 may sometimes hereinafter be referred to as the "Wolf Block Class").

Thus, the Debtor's creditor universe is limited to Aetna, SC Hyatt and Wolf Block, and the Debtor knew this to be the case at the time it filed the Initial Plan. Aetna and SC Hyatt have each cast ballots rejecting the Initial Plan and the Modified Plan. The Debtor's only other potential accepting, impaired class of creditors is the Wolf Block Class. However, for the reasons set forth within, this Court concludes that the Debtor has "artificially impaired" the Wolf Block Class, and, as such, that class must be deemed to be unimpaired and cannot constitute an accepting, impaired class for purposes of § 1129(a)(10).

**B. The Debtor's Artificial Impairment Scheme Is Impermissible.**

■ Even assuming *arguendo* that Wolf Block's $2,139.57 claim is a claim against the Debtor, it cannot constitute an accepting impaired class for purposes of § 1129(a)(10). Given the enormous financial resources available to the Debtor through GEPT and the Sequestered Funds Account, it is certain that the Debtor (through GEPT or through funds in the Sequestered Funds Account) would be able, if it so chose, to render unimpaired the $2,139.57 Wolf Block claim. Indeed, the Initial Plan provides that Aetna, at Aetna's option, may elect treatment of its Class 4 claim that will enable "Aetna [to be] paid $40,000,-000 Cash on the Effective Date from the New Value Contribution...." *See* Initial Plan, § 6.3 at 40. Moreover, as a result of the Hotel Payments made by SC Hyatt to the Debtor prior to and during the course of this case, the Debtor will hold funds in the Sequestered Funds Account at the time of the confirmation hearing in an amount that is exponentially larger than the *de minimis* amount of the Wolf Block claim and clearly sufficient to enable the Debtor, if it chose to do so, to render the Wolf Block claim unimpaired.[18] Notwithstanding the depth of the

16. See Debtor's Form of Ballot at 2 (stating that Class 3 and Class 5 "apparently are not occupied by any unpaid claims.").

17. Aetna and SC Hyatt have each objected to the Wolf Block claim on the grounds that, *inter alia,* the Wolf Block claim is a claim against the Debtor's ultimate beneficial owner, GEPT, and not a claim against the Debtor. For present purposes, it is not necessary to decide whether the Wolf Block claim is an allowable claim; this Court holds that the Initial Plan is unconfirmable as a matter of law even assuming *arguendo* that the Wolf Block claim is allowable against the Debtor.

18. At the Hearing, Aetna stipulated that the Debtor may utilize funds in the Sequestered

Funds Account to pay the full amount of the Wolf Block claim on the effective date of the Initial Plan. Also at the Hearing, the Debtor claimed that, because Aetna claimed a lien on the funds in the Sequestered Funds Account, all such funds must be dedicated to payment of the Aetna Claim, and, therefore, would not be available to pay the Wolf Block claim on the effective date of the Initial Plan. However, this Court does not accept the Debtor's explanation for its lack of funds with which to render the Wolf Block claim unimpaired. The Aetna claim is oversecured by a not insignificant margin by virtue of the market value of the Hotel Property (at least $52.5 million) and the funds in the Sequestered Funds Account. That equity cushion, as a matter of law, would amply justify a decision by the Debtor, if it so chose to allocate $2,139.57 from the

financial resources apparently available to it to fund the Initial Plan and pay the Wolf Block claim in full, in cash, on the Effective Date of the Initial Plan, the Debtor has chosen to impair the $2,139.57 Wolf Block claim by proposing to pay it (in full, with interest) in two installments within six months after the Effective Date of the Initial Plan. *See* Initial Plan, § 8.1 at 44–45.

■ The Debtor's impairment of the Wolf Block Class constitutes an abuse of § 1129(a)(10) such that the Wolf Block Class must be deemed to be *unimpaired* for purposes of § 1129(a)(10). The apparent reason behind the Debtor's decision to purposely impair a *de minimis* claim is to manufacture an accepting impaired class of claims in order to "cram down" Aetna's fully secured claim. Through such artificial impairment and "cramdown," the Debtor seeks to force Aetna to refinance the nonrecourse loan that the Debtor, who is solvent, elected not to pay at the loan's maturity nearly five (5) months prior to the Petition Date. Such a gross manipulation of the Chapter 11 process, termed "artificial impairment" by the case law, is prohibited. *See In re W.C. Peeler Co., Inc.*, 182 B.R. 435 (Bankr.D.S.C.1995) (Bishop, J.); *In re Windsor on the River Assoc., Ltd.*, 7 F.3d 127, 132 (8th Cir.1993) ("for *purposes of 11 U.S.C. § 1129(a)(10), a claim is not impaired* if the alteration of rights in question arises solely from the debtor's exercise of discretion.") (emphasis added).

■ Bankruptcy Code § 1129(a)(10) is designed to prevent a plan from being confirmed unless a class of creditors truly impaired by such plan support it. *Windsor on the River*, 7 F.3d at 131 ("The purpose of [Bankruptcy Code § 1129(a)(10) ] 'is to provide some indicia of support [for a plan] by affected creditors *and prevent confirmation where such support is lacking.*' ") (quoting *In re Lettick Typografic, Inc.*, 103 B.R. 32, 38

(Bankr.D.Conn.1989)) (emphasis added). Accordingly, an attempt to manipulate the Chapter 11 process by engineering technical and literal compliance with § 1129(a)(10) by artificially impairing a class of claims in the face of overwhelming opposition by truly impaired creditors constitutes a perversion of Chapter 11. *Windsor on the River*, 7 F.3d at 132 ("Confirmation of a plan where the debtor engineers the impairment of the only approving impaired class 'so distorts the meaning and purpose of Section 1129(a)(10) that to permit it would reduce (a)(10) to a nullity.' ") (citations omitted). Thus, under § 1129(a)(10), a reorganization plan that does not have support from creditors truly impaired by the plan cannot be confirmed. It is patently obvious here that the Debtor's only truly impaired creditor, Aetna, who opposes the Initial Plan and holds *more than 99.9%* of the claims against the Debtor, does not support the Initial Plan.[19]

In its *Windsor on the River* decision, the Eighth Circuit Court of Appeals struck down an artificial impairment scheme that closely resembled the facts of this case. In *Windsor on the River*, the debtor filed its Chapter 11 petition five days before the maturity date of the secured lender's mortgage note. The bankruptcy court determined that the $9.9 million claim of the mortgagee, which comprised more than 99% of the amount of all claims against the debtor, was fully secured. The debtor's plan proposed to cram down the mortgagee's claim by, among other things, extending the maturity date of the mortgage note by ten years. The debtor's plan also proposed to impair two other classes (Classes 2 and 3) of claims, which, collectively, comprised approximately $72,000 (less than 1% of the amount of the mortgagee's secured claim). The debtor proposed to impair those two classes by delaying payment to them for sixty days after the effective date of the plan. The debtor's partners had also proposed to

Sequestered Funds Account to the payment of the Wolf Block claim in full on the Effective Date. That the Debtor, in the exercise of its discretion, has unilaterally chosen to allocate the funds in the Sequestered Funds Account exclusively to the payment of the Aetna claim under the Initial Plan is not a sufficient basis for the Debtor to claim that it lacks funds with which to render the Wolf Block claim unimpaired.

19. The Initial Plan treats the Hyatt Claim as unimpaired. *See* Initial Plan, § 4.3 at 30–31. This Court presently considers the Hyatt Claim to be unimpaired under the Initial Plan in light of the Hyatt Order, which precludes rejection or avoidance of the SC Hyatt Agreement.

make a $1,000,000 capital contribution under the plan; nearly one-half of that capital contribution would be used to pay the mortgagee the sum of $500,000 on the plan's effective date.

The Court of Appeals noted that the debtor certainly could have rendered Classes 2 and 3 unimpaired by using a small portion of the $500,000 proposed to be paid to the mortgagee on the effective date to pay the claims in Classes 2 and 3 on the effective date. The Court of Appeals recognized that the only purpose for impairing Classes 2 and 3 was to manufacture an impaired class "to ensure approval by at least one 'impaired' class as required by section 1129(a)(10)." *Id.* at 133. Further recognizing that "[o]nce the arbitrary manipulation of claims is exposed, [the secured mortgagee] becomes the only creditor whose claim is impaired," *id.*, the Court of Appeals struck down the debtor's plan and dismissed the debtor's case. In doing so, the Court of Appeals unequivocally rejected the deliberate engineering of an impaired class to meet the technical requirement of obtaining an accepting impaired class. Specifically, the Court of Appeals held that such a manufactured impaired class will not be considered impaired for purposes of § 1129(a)(10). *Id.* at 132.

The Fourth Circuit Court of Appeals likely would join the Eighth Circuit's condemnation of artificial impairment schemes that are designed to engineer technical compliance with § 1129(a)(10). *See In re W.C. Peeler Co., Inc.,* 182 B.R. 435 (Bankr.D.S.C.1995) (Bishop, J.). The Fourth Circuit prohibits separate classification of similar claims where such classification is motivated to secure the vote of an accepting, impaired class of claims under § 1129(a)(10). *See In re Bryson Properties, XVIII,* 961 F.2d 496, 503 (4th Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992). Equally significant, the *Bryson* decision also held that priority tax claims, which are accorded preferential treatment under § 1129(a)(9)(C), "are not an impaired class that can accept a plan and *bind other truly impaired creditors to a cram down.*" *Id.* at 501, n. 8. Clearly, in the Debtor's case, the treatment accorded to the Wolf Block claim under the Initial Plan does not render the Wolf Block claim "truly impaired."

Additionally, in an influential recent decision in this district, Judge Bishop similarly has rejected an artificial impairment scheme virtually *identical* to the one proposed here by the Debtor. In *W.C. Peeler Co., supra,* a solvent debtor proposed to impair its only unsecured claim, which amounted to less than $2,000 and was held by the debtor's prepetition counsel, by paying such claim in full, with interest, but stretching out payment for six months. The purpose of such impairment was apparently to "cramdown" the fully secured claims of the Debtor's first and second mortgagees, who held claims exceeding $600,000 and $200,000, respectively. Judge Bishop flatly and unequivocally rejected such artificial impairment scheme as bad faith, observing:

> I find that the Debtor has failed to meet its burden of proving that [the unsecured creditor] is a *truly impaired creditor* whose acceptance can consign the other creditors to a cramdown.... In order for a claim to be considered "impaired" under 1129(a)(10) so as to cause "cramdown" of another creditor's claim, it is incumbent upon the debtor to show to the satisfaction of the court that it is necessary to impair the accepting class for economical or other justifiable reasons. In other words, the debtor must prove that impairment of the particular claim is needed for it to realize and achieve reorganization, not just to trigger "cramdown". Without this showing, a debtor could manipulate the bankruptcy code to create or to engineer an artificially impaired claim and this constitutes bad faith. The Debtor was unable to advance any convincing economic justification for the delay in payment.... The Debtor's failure to meet the requirements of § 1129(a)(10) prevents confirmation of the second amended plan or any other plan that "cramdowns" (sic) the claim of [the mortgagee movant].

*Peeler,* 182 B.R. at 437–38.

The prohibition of artificial impairment of a class of claims in order to obtain technical compliance with § 1129(a)(10) has been overwhelmingly endorsed by the case law. *See*

*In re Investors Fla. Aggressive Growth Fund Ltd.*, 168 B.R. 760, 767 (Bankr.N.D.Fla.1994) (". . . there is simply no credible reason to believe that the payment of these claims in full at the Effective Date of the plan will in any way unduly burden the Debtor or threaten the feasibility of the plan. The court therefore finds that the Debtor's plan has artificially impaired the [general unsecured claimants] and that this class must be treated as if no impairment existed."); *In re Daly*, 167 B.R. 734, 737 (Bankr.D.Mass.1994) ("Thus the impairment of [the] claim has no reasonable basis other than the need to create an accepting impaired class. The cases are clear that this is impermissible. A Debtor may not satisfy § 1129(a)(10) by manufacturing an impaired class for the sole purpose of satisfying § 1129(a)(10) and thereby forcing the plan upon a truly impaired class that has voted to reject the plan."); *In re North Washington Center Ltd. Partnership*, 165 B.R. 805, 810 (Bankr.D.Md.1994) (same); *In re Dean*, 166 B.R. 949, 954 (Bankr.D.N.M. 1994) (same); *In re North Vermont Assoc., L.P.*, 165 B.R. 340, 343 (Bankr.D.D.C.1994) (same); *In re Boston Post Road Ltd. Partnership*, 145 B.R. 745, 747 (Bankr.D.Conn. 1992), *aff'd*, 154 B.R. 617 (D.Conn.1993), *aff'd*, 21 F.3d 477 (1994), *cert. denied*, ⸺ U.S. ⸺, 115 S.Ct. 897, 130 L.Ed.2d 782 (1995) (same); *In re River Village Assoc.*, 1993 WL 243897, *4 (E.D.Pa.1993) (same); *In re Miami Center Assoc., Ltd.*, 144 B.R. 937, 943 (Bankr.S.D.Fla.1992) (same); *In re Washington Assoc.*, 147 B.R. 827, 831 (E.D.N.Y.1992) ("The $26,800 of the unsecured claims may well be an artificially impaired class. The Debtor . . . assuredly has the funds to pay these claims in full at confirmation and if for some reason such funds are not available, *the Debtor's partners, in all likelihood, have access to funds sufficient to pay these claims at confirmation.*") (emphasis added); *In re Lettick Typografic, Inc.*, 103 B.R. 32, 38–39 (Bankr.D.Conn.1989) (same).[20]

In the present case, the Debtor's artificial impairment of the $2,139.57 Wolf Block claim becomes particularly transparent when one notes that one of the two treatment options prescribed in the Initial Plan for Aetna's secured claim is a lump sum payment of $40 million in cash on the Effective Date of the Initial Plan and the further payment in full on the Effective Date of any unsecured claim of SC Hyatt. *See* Initial Plan, § 6.3. Even without the funding of GEPT, there is no doubt that the Wolf Block claim could be paid and ordinarily would be paid from funds generated from the Hotel operations or it could be paid from the equity in the Hotel Property. Yet, notwithstanding the enormous financial resources purportedly available to the Debtor through GEPT for the purpose of funding a plan and the funds in the Sequestered Funds Account, the Debtor has failed to articulate any credible reason why the impairment of the Wolf Block claim is necessary for economic or other justifiable reasons.[21] *See Peeler*, 182 B.R. at 437–38. It is patently clear that the Debtor's artificial

---

**20.** *Compare L & J Anaheim Assocs.*, 995 F.2d 940 (9th Cir.1993) and other cases within the Ninth Circuit following *L & J Anaheim, e.g., In re Hotel Assocs. of Tucson*, 165 B.R. 470 (9th Cir. BAP 1994) and *In re 7th Street & Beardsley Partnership*, 181 B.R. 426 (Bankr.D.Ariz.1994). Those cases analyze "artificial impairment" under the rubric of § 1129(a)(3) rather than under § 1129(a)(10). Significantly however, although the analytical process of the Ninth Circuit cases differs from that of this Court (and from the clear majority of courts that have addressed the manipulation of the confirmation process that this Court terms "artificial impairment"), the Ninth Circuit cases reach the same result: such manipulation is prohibited.

**21.** The Debtor's purported "legitimate business reasons" for impairing the Wolf Block claim are not credible and do not withstand even the most slight scrutiny. The Debtor offers that as it de-

votes all of its cash, which is subject to the lien of Aetna, to the (partial) paydown of Aetna's claim on the effective date of the Initial Plan, it has no cash to pay the Wolf Block claim. This ignores the fact that the Debtor has access to, and the Initial Plan depends on, the vast funding ability of GEPT. Quite simply, the Debtor could obtain $2,139.57 more from GEPT or pull it from the ordinary operations of the Hotel. As the Initial Plan proposes as one option to pay Aetna a lump sum of $40 million, it cannot seriously be claimed that an additional $2,139.57 is unavailable. Alternatively, the Debtor could refrain from asking GEPT for any more money, and, as recognized by the *Windsor on the River* court, simply pay down Aetna's claim by $2,139.57 less on the effective date of the Initial Plan. In either event, no "legitimate business reason" exists to justify the impairment of the Wolf Block claim by this solvent Debtor.

impairment of the $2,139.57 Wolf Block claim is intended to engineer the confirmation of the Initial Plan over the objection of the Debtor's only truly impaired creditor, Aetna, who opposes the Initial Plan. In such an event, equity does not allow Wolf Block's purported claim to be used by a solvent debtor to manipulate confirmation requirements. A review of case law has revealed no attempt at artificial impairment more brazen in its lack of economic justification than that presented by the Initial Plan and the Court therefore rejects the Debtor's transparent artificial impairment scheme. As the artificially impaired Wolf Block Class must be deemed to be unimpaired for purposes of § 1129(a)(10), no accepting impaired class exists, and the Initial Plan cannot be confirmed.

■ The Debtor requests that this Court employ a concept of impairment under § 1129(a)(10) that utilizes a strict literal interpretation of impairment pursuant to the provisions of § 1124. This would require that any alteration of a creditor's rights would constitute impairment for purposes of § 1129(a)(10). However, the Debtor's strict interpretation of impairment does not accomplish the goal of § 1129(a)(10), i.e. to determine whether a class of claims that is "truly impaired" has nonetheless accepted a plan. According to the legislative history of the amendment which added § 1129(a)(10):

> Paragraph (10) makes clear the intent of section 1129(a)(10) that one "real" class of creditors must vote for the plan of reorganization. A class that is deemed to have accepted the plan because it is unimpaired or acceptance of a small class of claims permitted to be created for administrative convenience will not satisfy this requirement.

S.Rep. No. 150, 97th Cong., 1st Sess.1981. An interpretation such as proposed by the Debtor to be applied in this case would render § 1129(a)(10) a nullity.

The Debtor essentially implores this Court to find that the doctrine of artificial impairment does not exist under the express statutory language of the Bankruptcy Code. Thereunder, once a class is impaired under § 1124 and votes to accept, the requirements of § 1129(a)(10) are met. The Debtor argues that this should be true regardless of the manner and manipulations undertaken by the Debtor in either creating or preserving that class or its impairment. Several courts have recently accepted the Debtor's literal reading of the requirements of § 1129(a)(10), but also recognize that a review of the Debtor's motives or actions must still be made under § 1129(a), but characterize that review as one to be undertaken under the § 1129(a)(3) good faith analysis. See, In re Ridgewood Apartments of DeKalb County, Ltd., 183 B.R. 784 (Bankr.S.D.Ohio 1995); In re Beare Co., 177 B.R. 886 (Bkrtcy.W.D.Tenn.1994); In re Hotel Associates of Tucson, 165 B.R. 470 (9th Cir. BAP 1994); In re Creekstone Apartments Associates, L.P., 168 B.R. 639 (Bkrtcy.M.D.Tenn.1994).

Following that argument, the Debtor asserts that the focus of any good faith determination cannot be summarily made without analyzing all the terms of the Initial Plan and all of the facts and circumstances surrounding it, including the conduct of creditors as it relates to the voting and existence of claims, i.e., the totality of circumstances. In relying on this argument, this Debtor on one hand implies that the decision on the subject motion must await the confirmation hearing (originally scheduled for September 18 and 19, 1995, but continued at the Debtor's request to September 27, 1995), yet on the other hand admits that no new evidence (different than that which has already has already been presented to the Court in the Dismissal Hearing, Hyatt Adversary proceeding, and the hearings regarding claims of SC Hyatt and Wolf Block and this Motion) would be presented.

The Debtor, through its counsel, has indicated, and this Court agrees, that all of the facts needed to determine artificial impairment or the good faith issue of § 1129(a)(3) have been previously submitted to this Court. Furthermore, this Court has thoroughly considered the evidence produced at the previous Dismissal Hearing and the Hyatt Adversary Proceeding and has thoroughly reviewed the Debtor's Initial Plan, Conditional Modification, the GEPT Commitment and the Debtor's First Amendment Clarifying or

Technically Modifying the Plan filed on September 6, 1995.

After considering the totality of circumstance of this case and after a full analysis of the merits of the Initial Plan, Conditional Modification, GEPT Commitment and Debtor's Clarification, and after considering the conduct of both the Debtor and the creditors in this case, the Court concludes that the Initial Plan cannot be confirmed based on the acceptance filed by Wolf Block, whether that determination is characterized as being made either under a theory of artificial impairment which violates § 1129(a)(10) or as a lack of good faith under § 1129(a)(3).

Finally, the Debtor asserts that confirmation of the Initial Plan should not be denied if there is any reasonable hope for confirmation. Presently, both the Initial Plan and Conditional Modification are contingent upon funding by GEPT. The Debtor has admitted it cannot fund a plan through operations. At the hearing on this Motion and according to the Debtor's Clarification filed September 6, 1995, the Debtor asserts that GEPT will *not* fund any plan unless the SC Hyatt Agreement is rejected or avoided. Pursuant to the Order of August 25, 1995, this Court found no grounds to avoid or reject the SC Hyatt Agreement. While a Motion to Reconsider has recently been filed by the Debtor, it is scheduled after the confirmation hearing in this case. While there are appellate possibilities and the results of an arbitration process still available, it does not appear likely that these alternatives could result in the required avoidance or rejection in the near

future. Therefore, based on the record as presently presented by the Debtor, it appears unlikely that the necessary funding is available to confirm the Initial Plan.

■ As a final matter, this Court observes as a separate basis for denying confirmation and according to express statutory language, that the Initial Plan is unconfirmable because Wolf Block's claim as one of an insider, may not be counted as meeting the requirements of § 1129(a)(10).

## C. *Absence of Improper Creditor Scheme To Control Confirmation Process.*

■ The Debtor also argues that its artificial impairment of the Wolf Block Class should be permitted because SC Hyatt (and Aetna) have engaged in a "systematic" scheme to eliminate creditors so that the Debtor will lack a larger accepting, impaired class with which to confirm a plan. Such creditors allegedly "eliminated" consist of the Trade Claims and the Tax Claim. The Debtor's argument of "forced" artificial impairment fails for the following principal reason.

The Debtor has failed to introduce any evidence that would demonstrate (or negate SC Hyatt's evidence) that the Trade Claims and the Tax Claim were not paid by SC Hyatt pursuant to the terms of the SC Hyatt Agreement and consistent with SC Hyatt's past practice and in the ordinary course of SC Hyatt's business.[22] Pursuant to the terms of the SC Hyatt Agreement, SC Hyatt was required to pay the Trade Claims [23] and

---

22. In addition, it appears that the Trade Claims were never claims against the Debtor, but rather, claims against SC Hyatt. See *Agreement and Lease* dated November 2, 1973, pages 24 and 26, "all costs and expenses incurred by Hyatt". This appears corroborated by the Debtor's Initial Statements and Schedules, which declare that any Trade Claims were claims against SC Hyatt or Hyatt and not against the Debtor. Although the Original Schedules were amended by the Amended Statements and Schedules to include the Trade Claims as claims against the Debtor, it is noted that the Amended Schedules were filed only after the Aetna Dismissal Motion and the SC Hyatt Dismissal Motion were filed against the Debtor, moving to dismiss this case on the basis of, *inter alia*, lack of creditors.

23. The Debtor has asserted that Pitney Bowes, an equipment lessor, was a creditor of the Debtor. This court need not specifically determine whether Pitney Bowes would have had a claim against the Debtor (or extrapolate an accepting vote), as the issue is obviated for two reasons. First, as explained below, it cannot be held that S.C. Hyatt was acting other than in the proper, ordinary course of business when it paid off the Pitney Bowes lease. Second, even if Pitney Bowes had been able to assert a claim against the Debtor, such a claim would have been in the approximate amount of $20,000. In the scope of this case, with Aetna's claim approximating $50 million, this claim, even when added to the Wolf Block claim, remains no less *de minimis* under the *Peeler* decision. It is noted that in the *Peeler* case, the Debtor was prohibited from impairing a claim that constituted .25% of the outstanding

the Tax Claim. SC Hyatt asserts that, because it is a lessee under the SC Hyatt Agreement, the gross receipts of the Hotel Property belong to SC Hyatt and its actions were proper notwithstanding the Debtor's commencement of this case.

The Debtor takes the position that the SC Hyatt Agreement is not a lease, but rather a management agreement, so that SC Hyatt should be deemed to have improperly paid the Debtor's alleged creditors. Regardless of whether the SC Hyatt Agreement is ultimately determined to be a lease or a management agreement (a decision which this Court has not yet been required to make), it cannot be said that, considering the terms of the SC Hyatt Agreement and the course of conduct surrounding it, SC Hyatt acted improperly in interpreting the SC Hyatt Agreement as a lease and conducting its actions correspondingly. To the contrary, the evidence leads this Court to conclude that SC Hyatt acted in good faith by interpreting the SC Hyatt Agreement as a lease, and considering itself a lessee, so that SC Hyatt continued to pay creditors as it had been doing for the past twenty years. Indeed, this interpretation appears corroborated by the Debtor's Initial Statements and Schedules, which expressly declared that the Trade Claims and the Tax Claims were claims against SC Hyatt or Hyatt and were not assertable against the Debtor. The import of this is not whether the SC Hyatt Agreement is, as a conclusive, legal matter, a lease or a management agreement. Rather, because SC Hyatt appears to have acted in good faith and pursuant to its fairly perceived duties under the SC Hyatt Agreement, it cannot be determined that SC Hyatt paid creditors in a bankruptcy-strategy scheme to eliminate creditors in order to deprive the Debtor of an accepting, impaired class. If SC Hyatt would have failed to timely pay the Trade Claims or the Tax Claim associated with the Hotel, it may have affected future operations and could have been cited by the Debtor as a

breach of the SC Hyatt Agreement and therefore as grounds for termination of the SC Hyatt Agreement. Similarly, the evidence does not show that Aetna engaged in an improper scheme by offering to purchase the Wolf Block claim for 200% of its face value. The offer was refused and therefore Aetna did not gain control over or use the claim to affect confirmation. To the contrary, Aetna's offer appears to have been made to test the *bona fides* of the Wolf Block claim.

Moreover, the cases cited by the Debtor to support its allegations of an improper creditor scheme to control the confirmation outcome are at best inapposite and indeed, possibly undermine the Debtor's argument. The Debtor cites *In re 7th Street & Beardsley Partnership*, 181 B.R. 426, 432 (Bankr. D.Ariz.1994) as holding that a creditor cannot "bootstrap itself into an 'artificial impairment' argument by eliminating possible accepting impaired claims from the case." The *7th Street & Beardsley* case *holds no such thing;* instead, its prohibition of "bootstrapping" refers to the Court's rejection of a debtor's request to deem a claim (which had been purchased by a hostile creditor and voted against the debtor's plan) to have accepted the debtor's plan. *7th Street & Beardsley*, 181 B.R. at 431–432. Furthermore, the bankruptcy court in *7th Street & Beardsley* stated that, as it was bound by the Ninth Circuit's decision in *L & J Anaheim*, it would not analyze the issue of the debtor's "artificial impairment" of a class of claims under § 1129(a)(10), but expressly stated that it would analyze the propriety of such "artificial impairment" under the rubric of good faith at the forthcoming confirmation hearing. *7th Street & Beardsley*, 181 B.R. at 431. In any event, the type of creditor activity presented in *7th Street & Beardsley* is distinct from the behavior of SC Hyatt in a fundamental aspect: the creditor in *7th Street & Beardsley* was chiefly motivated to purchase claims against the debtor to defeat

claims in that case. Here, even assuming *arguendo* an approximately $20,000 claim of Pitney Bowes and the approximately $2,000 claim of Wolf Block, the combined $22,000 of claims represents less than *.05%* of outstanding claims. Accordingly, the addition of an alleged Pitney

Bowes claim would not enable the Debtor to justify the impairment of such, especially where the funds of GEPT, and the funds in the Sequestered Funds Account, are at the Debtor's disposal.

the confirmation; by contrast, SC Hyatt appears to have had good reason to pay the Trade Claims and the Tax Claim pursuant to its interpretation of its obligations under the SC Hyatt Agreement and in the usual course of the operations of the Hotel. SC Hyatt's good faith, ordinary payment of claims as required by the SC Hyatt Agreement may not be used to justify the artificial impairment scheme proposed by the Debtor.[24]

### CONCLUSION

Pursuant to all of the foregoing Findings of Fact and Conclusions of Law, the Court hereby grants the Aetna Motion. Confirmation of the Initial Plan is denied with prejudice on the ground that the Initial Plan fails to satisfy Bankruptcy Code § 1129(a)(10) and § 1129(a)(3).

**AND IT IS SO ORDERED.**

---

**24.** To the extent that *In re Consolidated Operating Partners, L.P.,* 91 B.R. 113 (Bankr.D.Colo.1988), does not prohibit artificial impairment on the part of a debtor, this Court respectfully disagrees with that non-binding decision and adopts the recognition of the doctrine of artificial impairment in *In re W.C. Peeler, supra.*